UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

AYELET POTTASH,                                    Civil Action No: 19 Civ 4530

                          Plaintiff                **COMPLAINT**
                                                   *Jury Trial Demanded*

            -against-

HELLO LIVING, LLC., ELI KARP,
and MIKE WOODSON,

                          Defendants.

_____

     PLAINTIFF AYELET POTTASH by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

     1.    This is a civil action brought on behalf of Plaintiff against Defendant Hello Living, (hereinafter referred to as "Defendant Hello Living"), Defendant Eli Karp ("Defendant Karp"), and Defendant Mike Woodson ("Defendant Woodson"), (collectively known as "Defendants") for gender, pregnancy and religious discrimination and retaliation in violation of Title VII and the Pregnancy Discrimination Act ("PDA"), the New York State Human Rights Law, and the New York City Human Rights Law, together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

### PARTIES

     2.    Plaintiff Ayelet Pottash (hereinafter referred to as "Plaintiff") is a Jewish female citizen of the United States who currently resides in Brooklyn, New York and who was formerly

employed by Defendant Hello Living. Plaintiff was pregnant and/or an individual with family caregiving responsibilities at all relevant times.

3.    Upon information and belief, at all times herein, Defendant Hello Living was and is a corporation registered in New York and permitted to do business in New York. Upon information and belief, Defendant Hello Living's headquarters are located at 33 35th Street, 6th Floor, Brooklyn, NY 11232, where Plaintiff was employed.

4.    Upon information and belief, Defendant Eli Karp is the CEO of Defendant Hello Living, and was a supervisor to Plaintiff. Defendant Karp was employed at Defendant Hello Living's headquarters located at 33 35th Street, 6th Floor, Brooklyn, NY 11232, where Plaintiff was employed.

5.    Upon information and belief, Defendant Woodson is the CFO of Defendant Hello Living, and was a supervisor to Plaintiff. Defendant Woodson was employed at Defendant Hello Living's headquarters located at 33 35th Street, 6th Floor, Brooklyn, NY 11232, where Plaintiff was employed.

6.    Defendants are and were, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws.

7.    Plaintiff is and was, at all times relevant herein, Defendants' "employee" within the meaning of all relevant Federal, State and local laws.

## JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS

8.    This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' discrimination against Plaintiff based on gender, pregnancy, and religion, as well as Defendants' retaliation and wrongful discharge of Plaintiff.

9.     This Court has Jurisdiction over this action under 42 U.S.C.A. § 2000(e) et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).  This Complaint is also brought pursuant to the New York State Human Rights Law and the New York City Human Rights Law.

10.     Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

11.     All conditions precedent to filing the instant action have been fulfilled. On or about November 16, 2018 Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about June 13, 2019 issued Plaintiff a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## FACTUAL BACKGROUND

### Plaintiff is Hired at Defendant Hello Living Because of Her Exceptional Experience

12.     Plaintiff is a certified public accountant who graduated valedictorian with a Bachelor of Science in Accounting from Yeshiva University's Sy Syms School of Business, and who has significant experience in corporate accounting, including as an accountant at Deloitte, the internationally renowned accounting firm.

13.     On March 3, 2017, Plaintiff drove her father to a meeting that he had scheduled with business associate Eli Karp, Founder and CEO of Defendant Hello Living (hereinafter "Defendant Karp" and "Defendant Hello Living")

14.     As they were exchanging small talk, Plaintiff's father told him that Plaintiff was pregnant and he was going to be a grandfather, to which Defendant Karp offered his "Congratulations." Plaintiff was due to deliver in the beginning of August 2017.

15.     Defendant Karp asked Plaintiff what she did for a living, and she said she was a corporate accountant. Surprised, he said that he was looking for an accountant and asked for her

experience. When she told him, Defendant Karp told her that he was extremely impressed, and soon offered to hire her for the position.

### Defendant Woodson Is Immediately Hostile Because Plaintiff is a Woman, Pregnant and an Orthodox Jewish Woman

16.     Defendant Karp told Plaintiff that he would like her to meet with his Chief Financial Officer Mike Woodson (hereinafter "Defendant Woodson"), and his Staff Accountant and Human Resources Associate Marisol Rosario (hereinafter "HR Associate Rosario").

17.     Defendant Karp left the room, and in the next moment Defendant Woodson and Staff Accountant and HR Associate Rosario called her into a separate office to speak to her.

18.     Plaintiff is a modern Orthodox Jewish woman. On that day, Plaintiff was wearing a wig, a long skirt, and a shirt, as is customary for Orthodox women.

19.     Defendant Woodson, who is not Jewish, looked Plaintiff up and down and upon information and belief immediately realized that she was an Orthodox Jewish woman. He immediately asked Plaintiff how many children she had. Upon information and belief, Defendant Woodson asked Plaintiff this because he knew that she was pregnant, and because of the stereotype that all Orthodox Jewish women have many children.

20.     Plaintiff said that she did not have any children, but that she was married, and pregnant with her first.

21.     Defendant Woodson stared at Staff Accountant and HR Associate Rosario, who looked embarrassed but finally stammered, "Well, how many children do you want?" Plaintiff was surprised, but not ashamed, and said, with conviction "I don't know how many children I want."

22.     Plaintiff immediately changed the conversation back to the subject at hand. After she told Defendant Woodson about her extensive experience, Defendant Woodson reluctantly told her he was impressed.

23.     Defendant Woodson abruptly ended the interview but acknowledged that Defendant Karp was strongly recommending that they hire her due to her experience, and that they would get back to her.

### Defendant Karp Aggressively Recruits Plaintiff, Making Her Promises About Maternity Leave and Childcare Accommodations

24.     On March 11, 2017, Defendant Karp called Plaintiff and offered her a Controller position over the phone. Plaintiff told him that she would think about it.

25.     Defendant Karp then called her again to tell her that she should take the job. Bizarrely, he then contacted her father to pressure him to urge her to take the job.

26.     In an effort to convince Plaintiff to take the job, Defendant Karp promised Plaintiff that she would receive a salary increase within three months of her start date. He also said that Defendant Hello Living's many million-dollar projects were highly lucrative, and that he would be giving her large, per project bonuses of at least $10,000 a project, two of which had expected completion dates of Summer 2017.

27.     Plaintiff asked that she be given three months maternity leave. Plaintiff also insisted that she be allowed to work from home two days a week after her maternity leave. The drive from Plaintiff's home to Defendants' office was one and half hours each way, and so Plaintiff knew that as a new mother, a three hour commute each day would not allow her to properly care for her baby after a full 40 hours of work each week.

28.     Defendant Karp agreed to Plaintiff's terms.

29.     On March 28, 2017, Plaintiff accepted the position of Corporate Controller at a salary of $100,000. Upon information and belief, the average rate for Corporate Controllers was approximately $130,000 at that time. Plaintiff nonetheless accepted the job because she had been

promised three months paid maternity leave; a flexible schedule that allowed her to work from home twice a week; a raise within the first three months of work; and several bonuses.

30.     As Controller, Plaintiff was charged with leading the Accounting Department. She was responsible for Defendant Hello Living's financial statements, general ledger, processes and controls, payroll, accounts payable, and accounts receivable.

**Defendant Woodson is Immediately Hostile to Plaintiff Because She is Pregnant and an Orthodox Jewish Woman**

31.     Plaintiff started at Defendant Hello Living on April 24, 2017. She was assigned to the office space where Defendant Woodson sat. She was to report to Defendant Woodson and he was to supervise her.

32.     Immediately upon her first day, Defendant Woodson refused to cooperate with her, train her, or help her figure out Defendant Hello Living accounting programs. He spoke to her in a belittling and degrading tone, cut her off, dismissed her, and refused to help her with any project.

33.     Plaintiff reported this behavior to Staff Accountant and HR Associate Rosario several times. She explained that it was very difficult to start a new job under these conditions.

34.     Staff Accountant and HR Associate Rosario acknowledged that Defendant Woodson did not want to train her, and that unfortunately, there was nothing that she could do about it, but that she would try to help Plaintiff train herself.

35.     Upon information and belief, Defendant Woodson believed that because she was expecting a baby, and because she was an Orthodox Jewish woman whom he believed wanted many children, she could not be a good employee.

36.     Despite Defendant Woodson's hostile attitude towards her, Plaintiff began looking through Defendants' accounting records and making herself familiar with Defendants' accounting practices.

## Plaintiff Immediately Sees Defendants' Accounting Practices
## Are in Shambles

37.    Plaintiff was appalled to discover that Defendants' accounting records were in disarray. There was no organization to Defendants' accounts payable and accounts receivable. No one had created a budget for Defendants, and there were issues with Defendants' taxes.

38.    The team was also incredibly behind in its accounting records, with information and transactions from the prior year not having been addressed at all from the moment Plaintiff started at Defendant Hello Living.

39.    When Plaintiff approached Defendant Woodson with these issues, he became belligerent and told her that Defendants had always done its accounting "that way." Plaintiff soon learned that Defendant Woodson had instituted the flawed accounting "practices."

40.    Plaintiff was flabbergasted and could not believe that Defendant Woodson had allowed the accounting system to get so out of control.

41.    Nonetheless, Plaintiff set out to try and establish control and order to Defendants' accounting practices.

## Defendant Karp Asks Plaintiff to Engage in Illegal Accounting Practices

42.    In her first months at Defendant Hello Living, on several occasions, a bill from one of Defendants' projects became due but there were not enough funds in that project's budget to pay the bill.

43.    Defendant Karp came in several times to Plaintiff and Defendant Woodson's office and told Plaintiff to take funds from one project and pay the bill for a different project.

44.    After Defendant Karp left the office, Plaintiff told Defendant Woodson that she could not do this because it was illegal - each project had different investors and Defendants could not use an investors' money for any other purpose than the project they had invested in.

45.    Defendant Woodson ordered her to illegally transfer the funds anyway. When she refused, he furiously said that he would do this himself.

46.    Defendant Woodson already disliked her because she was a pregnant Orthodox Jewish woman, and he became even more angry and hostile to her when she refused to cooperate in Defendants' illegal activity.

**Defendant Woodson Sexually Harasses Plaintiff**

47.    Soon however, Defendant Woodson's behavior became even worse. He began sexually harassing Plaintiff. Defendant Woodson's behavior towards Plaintiff was erratic. One minute he was hostile and dismissive, and the next minute he was turning his chair in their office towards her, harassing her, and telling her highly inappropriate sexist and explicit anecdotes.

48.    Initially, Defendant Woodson began making sexist comments about his ex-wife. For example, Defendant Woodson said repeatedly that his-ex-wife spent his money "like women do" while they were together but was quick to divorce him when the financial crisis hit and he lost his job and his savings.

49.    Defendant Woodson also spoke about his daughter very strangely, and regularly referred to her as his "girlfriend." He was extremely inappropriate when talking about his daughter, whom he regularly referred to as "hot." He constantly showed Plaintiff his daughter's modeling pictures, and asked Plaintiff if she thought his daughter was "hot" too.

50.    He emailed Plaintiff website links showing video footage and images of his daughter modeling. Plaintiff felt extremely uncomfortable with the fact that he sexualized his daughter.

51.    Defendant Woodson also sexualized other women. He harassed Plaintiff by towering over her desk and insisting that she look at pictures of his "hot dates" on his phone.

52.     He told Plaintiff about a woman he had been pursuing who was an exotic dancer, and ordered Plaintiff to come over to his desk to watch video. Plaintiff was forced to watch footage of the woman dancing on a pole and on tables in fishnet stockings and little coverage.

53.     Each time Defendant Woodson harassed her, Plaintiff turned her back to him and continued working without comment, making it clear that his comments and anecdotes made her uncomfortable. However, Defendant Woodson could not stop himself from harassing her.

54.     Plaintiff feared that if she angered him in any way, her job would be in serious jeopardy, and she was terrified to say anything back to him.

**Plaintiff Reports Defendant Woodson's Sexual Harassment to Human Resources**

55.     Due to his ever-worsening behavior, Plaintiff decided that she had to report him to Human Resources. She told Staff Accountant and HR Associate Rosario that Defendant Woodson was making sexist and sexually inappropriate comments to her in the office. To Plaintiff's surprise, rather than act to stop the harassment, or reprimand or discipline Defendant Woodson in any way, Staff Accountant and HR Associate Rosario indicated that there was nothing that Defendants could do about Defendant Woodson's behavior and that she should ignore it.

56.     Upon information and belief, management at Defendant Hello Living knew that Defendant Woodson sexually harassed other female employees before and at the same time as he harassed Plaintiff and allowed it.

57.     Upon information and belief, Defendants failed to maintain a valid sexual harassment policy or provide any education on same to Human Resources or to any employees.

**Plaintiff Refuses to Engage in Illegal Accounting Practices**

58.     Soon, Plaintiff realized that Defendants were engaging in serious tax fraud.

59.     Defendant Karp regularly instructed Plaintiff and Defendant Woodson to invoice

his personal expenses as work expenses so that Defendants could commit tax fraud. Plaintiff refused to do so.

60.     In one incident out of many, in or about June 2017, Defendant Karp paid for many of the expenses for his son's wedding with Defendants' money.

61.     Defendant Karp strode into Plaintiff and Defendant Woodson's office and ordered her to create a false invoice stating that the wedding expenses were a business expense. She told Defendant Karp "Are you kidding me? We can't do this. You know we can't do this."

62.     Defendant Karp glared at Plaintiff and said, "Why not? I do it all the time. And [CEO Woodson] does it for me all the time."

63.     Plaintiff looked down and said "Ok, but this is not something I feel comfortable with, I'm sorry."

64.     Angrily, Defendant Karp turned to Defendant Woodson and barked, "Ok, then you take care of it." Upon information and belief, Defendant Woodson complied.

**Plaintiff Asks to Talk About Maternity Leave, and**
**Defendant Karp Brushes Her Off**

65.     In or about July 2017, Plaintiff was preparing for her maternity leave when she asked for an in-person meeting with Defendant Karp to confirm her maternity leave. Defendant Karp told Plaintiff that he "didn't have time" to discuss it with her.

66.     She reminded him that he had promised her three months paid leave and he told her "not to worry."

**Plaintiff Emails Defendant Karp About Maternity Leave**

67.     The week before she was due to give birth, Plaintiff emailed Defendant Karp while working from home and tried again to talk to him about her maternity leave. She reminded him

that he had promised her three months paid leave and asked for details on how to make arrangements for this to happen.

68.     Defendant Karp called Plaintiff two days later. He immediately said that he had never agreed to give her three months paid leave, and that he was only offering her ten weeks of unpaid leave.

69.     He further advised her that if she wanted paid time off, she would have to use the five vacation days and sick days.

70.     Plaintiff was flabbergasted that Defendant Karp was breaching their agreement.

71.     Defendant Karp then advised Plaintiff that her "joyous occasion [was his] sorrow," and that her pregnancy and right to maternity leave was a "burden" on him as a man and a business owner.

72.     He said: "This is how things are. I don't know what to tell you, I can't do anything more."

73.     Upon information and belief, Defendant Karp never intended to give Plaintiff the maternity leave he offered her in his effort to entice her to take the job.

74.     Utterly distraught, Plaintiff ended the conversation by saying she would have to think about things and hung up the phone.

**Defendant Karp Blatantly Discriminates Against and Heinously Insults Plaintiff as a Woman and a Breastfeeding Mother**

75.     In or about August 2, 2017, Plaintiff and Defendant Karp spoke on the phone again about her maternity leave. She insisted, again, that Defendant Karp give her the maternity leave that he offered her when she took the job.

76.     During this conversation, Defendant Karp told Plaintiff that he would not provide her with the maternity leave he had promised her because he knew that once Plaintiff gave birth,

she would just be a "mommy" and a "carriage pusher." He expressly stated that he believed that she would not want to return to work, so he did not want to pay her in vain.

77.     Needless to say, Plaintiff was extremely upset. She told him that she had accepted the position at the company because he had promised her three months of paid maternity leave and that what he was doing was not right. She also said that she was absolutely going to return to work and work as hard and as diligently as she had before she left, and as she had in every job she had previously.

78.     Defendant Karp refused to listen to Plaintiff, furiously telling her that even if she did return to work, after she gave birth she would be "very hormonal for a very long time" and that her "brain was not going to work like it should," after she gave birth.

79.     Defendant Karp then asked Plaintiff if she was planning on breastfeeding, and when she responded that she was planning on breastfeeding he became even more outraged and told her that was this was another reason that Plaintiff would not work as diligently as before.

80.     When Plaintiff informed him that she planned on pumping breast milk so that she could return to work full-time, he furiously berated her, saying he didn't want her "wasting his time" by pumping at the office, and that it "wasn't going to work out."

81.     Upon information and belief, Defendants failed to post the Breastfeeding Mothers Bill of Rights, as required by New York Public Health Law § 2505-a.

82.     Defendant Karp said that she should not breastfeed her child at all, because it would be "too difficult." He allegedly "knew this" because his wife "gave him hell" and was "miserable" while she was breast-feeding. Defendant Karp also said that he "did not allow" his wife to breast feed their youngest children because of this.

83.     He also told Plaintiff that his sister- in- law was able to breastfeed easily but that

was probably because she had "huge tits."

84.     Trying to ignore Defendant Karp's disgusting comments about her and his female family members, Plaintiff insisted again that she wanted to breast feed her child as long as she could, and assured Defendant Karp that pumping would not get in the way of her doing her work.

85.     By the end of the conversation, Plaintiff was devastated. She was able to negotiate only two weeks of paid maternity leave, as long as she agreed to "help" Defendants from home, four weeks of part-time work and a return to full-time work after ten weeks.

86.     Ever the accommodating employee despite the fact that he had heinously insulted her, Plaintiff assured him when he asked that while she was out on leave, she would help out Defendants from home. She sent several emails to Defendant Woodson offering to help, but he never replied.

87.     Plaintiff's maternity leave started on August 8, 2017.

### Defendants Hire Their First In-House Counsel

88.     When Plaintiff started working at Defendants, they did not have an In-House Counsel. Defendant Karp's Executive Assistant Joe Young (hereinafter "Executive Assistant Young"), who was in law school at night while working at Defendants, provided legal advice, drafted contracts, and conducted legal research for Defendant Karp.

89.     About two weeks after Plaintiff went on maternity leave, Defendants hired Donna Miller as In-House Counsel (hereinafter "In-House Counsel Miller").

90.     After In-House Counsel Miller's hire, Executive Assistant Young reported to her.

91.     Plaintiff hoped that In-House Counsel Miller would help to ensure that Defendants complied with discrimination laws and standard accounting practices.

**Defendants Forces Plaintiff to Pump Breast Milk in an
Unsanitary and Unsafe Room Under Construction**

92.     On October 18, 2018, the day before she returned from maternity leave, Plaintiff sent an email to Defendants to let them know that she would need a place to pump breast milk when she returned to work the next day. She was told to pump in the bathroom.

93.     Plaintiff knew that this was not at all sanitary and felt sick to her stomach at the thought of pumping in the dirty bathroom. The thought of feeding her newborn baby milk that was pumped in a dirty bathroom, and therefore susceptible to possible contamination, made her utterly sick and also scared her.

94.     There was only one women's bathroom at Defendant Hello Living, with only one stall, and the bathroom was almost always incredibly dirty, because it was only cleaned once every two weeks, if that. Furthermore, the plug in which she would plug in her pump was near the sink, which Plaintiff felt was dangerous because the plug could become in contact with the water.

95.     Although the bathroom was not an acceptable place to pump, she decided to wait until the next day to figure out where she could pump as she was concerned about being retaliated against if she complained.

96.     On October 19, 2017 Plaintiff returned to work. She told Staff Accountant and HR Associate Rosario that the bathroom was not a sanitary place to pump and that it made her uncomfortable. Staff Accountant and HR Associate Rosario suggested that perhaps she could pump in a side office of Defendant Hello Living that was currently under construction.

97.     Because the room was under construction, there were wooden planks and exposed electrical sockets everywhere. The room was filled with dust and grime and had glass walls, so it was exposed to other employees passing by.

98.     But, desperately needing to pump breast milk immediately, Plaintiff pumped there

that day. She turned away from the glass walls and hoped that no one would see her exposed breasts.

99. Shockingly, while pumping that day, one of Defendants' male employees walked by and saw her while she was exposed, which was extremely mortifying. Plaintiff sent an email to Staff Accountant and HR Associate Rosario the next day, October 20, 2017, telling her about the incident. She told Staff Accountant and HR Associate Rosario that they would have to find another solution.

100. Clearly apologetic at having to pass on such a disappointing message, Staff Accountant and HR Associate Rosario reported that Defendants did not have any other option for her – she was stuck either pumping in the side office, or in the bathroom. Knowing that the bathroom was entirely unsanitary, Plaintiff continued pumping in the side office even though it was under construction and she worried that it was unhealthy and had minimal privacy.

101. Plaintiff knew from her conversation with Defendant Karp while she was on maternity leave that he was entirely hostile to her pumping breast milk at all. Plaintiff was terrified that if she did not work while she pumped, she could be fired. She brought her laptop into the side room every day while she pumped and worked while she sat with the pump attached to her breasts.

102. Plaintiff was very concerned about the impact that her breast-feeding would have on her employment.

### Defendant Karp Demands That Plaintiff Breast Feed in the Same Room as the Male CFO Who Harassed Her

103. October 25, 2017, Defendant Karp found out that Plaintiff was pumping in the side office that was under construction. Defendant Karp came into Plaintiff's office, stood over Plaintiff, and screamed furiously that she could absolutely not pump in that office.

104.    He ordered Plaintiff to pump in her office, which she shared with Defendant Woodson.  When she balked due to the fact that Defendant Woodson worked there, he insisted that he would put up a "curtain" between them for "privacy."

105.    Plaintiff was mortified, especially because Defendant Woodson continued to make inappropriate sexually charged comments to her on a daily basis.

106.    Defendant Karp told her that this was her option, because if Plaintiff was pumping in the side office, she wouldn't be working and would be "wasting his time and money."

107.    Plaintiff told him immediately that she was incredibly uncomfortable pumping in front of anyone, much less her male boss.

108.    In response, Defendant Karp began to scream at Plaintiff even louder, asking Plaintiff why she "gave a shit if [her] tits were seen."

109.    Plaintiff could not bear to pump in the same room as Defendant Woodson, and so she secretly pumped in the side office, fearful that Defendant Karp would "find her out" and scream at her and threaten her again.

**<u>Defendant Woodson Continues to Sexually Harass Plaintiff</u>**

110.    Meanwhile, when she was working in the office Defendant Woodson continued to sexually harass her by making sexually explicit comments.

111.    Defendant Woodson continued to tell Plaintiff about the women that he dated and his sexual exploits. He told Plaintiff that the women he was dating were "nuts" and "crazy" and that another women who told him she didn't want to date him was just "intimidated" because he was a "successful CFO" and "too good looking for her."

112.    Plaintiff felt the most sick when Defendant Woodson talked about his aggressive pursuit of a married woman from his church. He totally disregarded the fact that the woman was

married when talking about her. This made Plaintiff incredibly uncomfortable: she thought that perhaps she would be safe from Defendant Woodson pursuing her because she was married, but because he did not care if a woman was married, she was fearful that he would aggressively pursue her despite the fact that she was a married woman.

113.    She felt extremely vulnerable and sick to her stomach.

**Plaintiff Reports the Harassment and Discrimination to**
**Staff Accountant and HR Associate Rosario and Executive Assistant Young**

114.    After the incident with Defendant Karp, Plaintiff did research on what New York City required Defendants to provide for breastfeeding mothers.

115.    Upon information and belief, New York City law requires employers to allow breastfeeding mothers the right to use paid break or mealtimes of no less than 20 minutes to pump milk. In addition, they are required to make reasonable efforts to provide a private, clean room for that purpose; the room cannot be a restroom or toilet stall and cannot be accessible to the public or other employees.[1]

116.    Utterly shaken up by her horrendous interaction with Defendant Karp, Plaintiff asked for a meeting with Executive Assistant Young.

117.    Plaintiff told Executive Assistant Young that Defendant Karp had refused to allow her to pump in a safe space, screamed at her about breastfeeding, and was creating a hostile work environment for her as a woman and mother.

118.    She also told him that she was extremely uncomfortable pumping in the same room as Defendant Woodson, which was a violation of New York City law, and asked him pleadingly what she should do.

119.    Executive Assistant Young said he would talk to Defendant Karp.

---

[1] New York State Labor Law Section 206-c.

120. The next day, October 26, 2018, Executive Assistant Young told Plaintiff that he had spoken with Defendant Karp and had insisted that Plaintiff have a place outside of her and Defendant Woodson's office to pump.

121. Executive Assistant Young then informed Plaintiff that he and In-House Counsel Miller had "looked up the statutes" (on breast-feeding rights in New York City) and confirmed that forcing Plaintiff to pump behind a curtain in her male boss' office was not legal.

122. He said that when he talked to him, Defendant Karp was incredibly resistant to allowing her to pump anywhere but in Defendant Woodson's office, but after Executive Assistant Young insisted, he agreed to allow her to pump in one of the side offices under construction. Executive Assistant Young told her although the situation was not "ideal", but this was the most he could get out of Defendant Karp.

123. Though Plaintiff knew that the side office that was dirty and under construction was not what Defendants was required to provide her by law, she was utterly relieved that she would not have to pump in front of Defendant Woodson and began to pump in the side office.

### Plaintiff Reports The Discrimination to In-House Counsel

124. On or about November 7, 2018 Plaintiff asked for a meeting with In-House Counsel Miller. She told In-House Counsel Miller that she felt Defendant Karp was discriminating against her because she was pumping breast milk, and that she was afraid she was going to get fired because of it.

125. Plaintiff informed her that before she went on maternity leave Defendant Karp had warned her not to breastfeed, and that because of this, she felt fearful every time she went to pump her breast milk. Plaintiff said that Defendant Karp had acted "differently" towards her since she started to pump breastmilk.

126.     Ignoring Plaintiff's obvious pleas for help with her blatant reports of gender and pregnancy discrimination, In-House Counsel Miller only said that Defendant Karp had been "miserable" for months because of business issues and changed the subject.

**Defendant Karp and Defendant Woodson Are Hostile to Plaintiff and Retaliate Against Her Because She Pumps Breast Milk**

127.     After Plaintiff reported the breastfeeding violations and insisted that Defendants follow the law Defendant Karp's behavior changed for the worse. He would not look at her, speak to her, or interact with her. Every time he looked her way, he had fury in his eyes. Plaintiff feared that she would be fired at any time.

128.     Each time Plaintiff went to pump Defendant Karp would glare at her as she passed his office. As a result, Plaintiff tried to avoid him whenever she could and essentially tried to "sneak by" him when she had to breastfeed.

129.     In addition, every time Plaintiff would go to pump, Defendant Woodson, whom she still shared an office with, asked with a hostile and annoyed voice, "You're going again?" Still, he continued to make sexually inappropriate comments to her.

130.     As a result of this harassment, Plaintiff felt gravely concerned about her job and well-being at work. She pumped less frequently and for shorter periods of time. Her milk supply took an immediate dip, which made her produce less milk for the baby, and she got infections in her breasts which required her to seek a lactation consultant.

131.     Defendant Woodson also continued to be hostile to Plaintiff when she communicated with him, refusing to work with her or assist her in any way.

**CEO Retaliates Against Her by Taking Away Her Work-From-Home Days**

132.     On November 15, 2017, Defendant Karp called Plaintiff into his office and told her with hostility that her working from home two days a week wasn't "working for him" because he

"didn't know what [she was] doing at home." He told her that she didn't want her "playing around" with his time.

133.     Plaintiff was shocked, and told him that they had agreed when she came to work for Defendants that she would have two full days working from home. She told him that she could not make the hour and a half commute into work every day and thus spend three hours less time with her new baby.

134.     Plaintiff told him that she was doing everything she was supposed to be doing while she was at home, and everything that Defendant Woodson asked her to do. She asked if Defendant Woodson had made any complaints about her work to him, and Defendant Karp admitted that there had been no complaints.

135.     Plaintiff insisted that there was no reason she could not work from home with her laptop, and that if Defendant Woodson had a problem with her, then he should let her know and they could talk about it.

136.     Upon information and belief, there was nothing in Plaintiff's position that required her to be in the office all five days of the week, as she could do her job responsibilities at home on her laptop with internet and accounting databases as she and Defendant Karp had agreed.

137.     Upon information and belief, Defendant Karp retaliated against Plaintiff for pumping breast milk at Defendants, and for reporting his illegal failure to accommodate her breastfeeding needs to Executive Assistant Young and In House Counsel Miller by attempting to alter the terms and conditions of her employment, and because he hoped that she would quit.

**Defendants Engage in Even More Illegal Activity**

138.     In or about November 2017, Defendant Karp again asked Plaintiff to engage in illegal accounting practices.

139.     Defendant Karp bought his son a home, renovated it, bought all the furniture, and then walked into Plaintiff's office and ordered her to invoice the expenses related to his son's home as "business expenses."

140.     As she always did when Defendant Karp made outrageous requests for her to engage in illegal accounting practices, Plaintiff told Defendant Karp that she did not feel comfortable doing this. Defendant Karp barked at Plaintiff "Get it done," and stormed out of the office.

141.     Plaintiff turned to Defendant Woodson and said, strongly, "I'm sorry, but I cannot do this," and Defendant Woodson replied shortly "Fine, I'll take care of it."

### Defendant Karp Retaliates Against Plaintiff for Pumping By Shockingly Calling Her Father to "Tattle" On Her

142.     On November 20, 2017, despite her avoiding him at all costs, Defendant Karp saw Plaintiff on her way to pump, and asked her where she was going. After she nervously told Defendant Karp that she was going to pump, she saw his face stiffen, and he looked at her in fury.

143.     While she was pumping, Plaintiff received a call from her father. He shockingly told her that Defendant Karp had just called him and told him that Defendant Woodson was having "problems" with her, that she "wasn't pulling [her] weight" and things "weren't working out."

144.     Plaintiff was disgusted and flabbergasted that Defendant Karp would call her father. Upon information and belief, he would not call a male employee's father.

### Plaintiff Reports Defendant Karp's Harassment and Discrimination to Staff Accountant and HR Associate Rosario and Defendant Woodson

145.     When Plaintiff finished pumping, she immediately went to report what had occurred to Staff Accountant and HR Associate Rosario.

146.      She reported that she could no longer handle the harassment, and that she did not

know what to do. She knew that she could not continue to work in an environment where she was discriminated against because she was a woman, and a mother.

147.    She told them that Defendant Karp had called her father to "tattle" on her for pumping her breast milk. Since she started pumping, she said, Defendant Karp harassed her repeatedly by constantly asking her in the hallways where she was going and what she was doing, and when she returned from pumping, ordering her sternly to "get to work."

148.    Staff Accountant and HR Associate Rosario, apologetic as always, said " that Defendant Karp felt "frustrated" by her breastfeeding.

149.    She reported that she only pumped every three hours, even when she needed to do so more often, because she was terrified of Defendant Karp, and that she felt extremely uncomfortable.

150.    When Defendant Woodson entered the room and joined the conversation, Plaintiff told him that she felt as if Defendant Karp was attacking her and harassing her, to which Defendant Woodson bizarrely told Plaintiff that he was "instigating" and "trying to cause trouble." She asked Defendant Woodson what she should do, and he said that he "would feel uncomfortable too."

151.    She then asked Defendant Woodson if he had any complaints about her performance, and he admitted that he had not.

152.    Plaintiff said to Staff Accountant and HR Associate Rosario and Defendant Woodson that she wanted to have a conversation with them and Defendant Karp so that they could tell him that she was in fact doing all of her work for them and was not a bad employee, and they agreed.

153.   Defendant Woodson then changed the subject to Defendants' questionable tax records, saying that there were over 200 expenses that were not accounted for, and that if they were audited the IRS would say that they "pulled the numbers out of [their] ass."

154.   Plaintiff again told Defendant Woodson that she wanted no part in it.

**Plaintiff Reports the Harassment to In-House Counsel Miller**

155.   Plaintiff went to In-House Counsel Miller extremely upset, and again reported the discrimination and retaliation. She told In-House Counsel that Defendant Karp had called her father to complain about her work because he was furious at her for pumping her breast milk.

156.   Plaintiff informed In-House Counsel Miller that Defendant Karp was incredibly hostile to her every time he saw her go to pump her breast milk, and that she was not pumping as often as she should because of this harassment. She also told her that the harassment has also affected her work as well.

157.   Shockingly, In-House Counsel responded by advising Plaintiff that maybe she should look for a new job closer to her house, or maybe online or part time, but closer to her baby, because "that was what she would do."

158.   Plaintiff told In-House Counsel Miller that she didn't want to get a new job, because she was successful at Defendants, but In-House Counsel shrugged.

159.   When Plaintiff suggested that she have a meeting with Defendant Karp to talk about the issue, In-House Counsel Miller bizarrely blurted out that she should never have a meeting alone with Defendant Karp because "his story changes." She advised Plaintiff to start looking for a new job "to cover herself."

160.    Plaintiff told In-House Counsel Miller that she would like to bring Defendant Woodson and Staff Accountant and HR Associate Rosario to meet with Defendant Karp, so that they could explain to him that she was excelling at her job.

### Defendant Karp and Defendant Woodson Tell Plaintiff Blatantly That They are Discriminating Against Her for Her Childcare Accommodations

161.    That same day, Plaintiff called Defendant Karp and asked him to have a meeting with him, Defendant Woodson, and Staff Accountant and HR Associate Rosario.  He reluctantly agreed to meet with her at the end of the day.

162.    Once in the meeting, Plaintiff told Defendant Karp that although he had told her father that her team was unhappy with her work, she had brought the team in to tell him that this was not true.  She told Defendant Karp that she felt like she was being singled out by him, especially since the breast-feeding incidents.

163.    Defendant Karp denied this, saying that the "real problem" was her working from home because he allegedly did not know what she was doing those days. He also accused Plaintiff of "not caring [about her work since she became a mother]."

164.    Plaintiff calmly assured him that when she worked from home she was working diligently, as she did every workday, and that she was doing exactly what she had been instructed to do by Defendant Woodson. She reiterated that her commute was one and a half hours each way, and that this was untenable because she was a new mother.

165.    Defendant Woodson aggressively agreed with Defendant Karp, saying that it was "a problem" that she worked from home two days a week. He told Plaintiff that she should be an hourly employee instead of a salary employee.

166.    Plaintiff objected to being made an hourly employee.

**Defendants Engage in Even More Illegal Activity**

167.    Plaintiff continued to diligently do her job, trying to implement accounting practices that were above board.

168.    Defendant Karp repeatedly came into the office to ask Plaintiff to re-do invoices so that his personal expenses were business expenses, and Plaintiff continued to refuse to do this. She told Defendant Karp that she would not do this, because it was "not legal."

169.    When Defendant Karp left the room, Plaintiff turned to Defendant Woodson and said, "You know this is illegal, what are you going to do?" and Defendant Woodson said, "I'll handle it." Plaintiff observed that Defendant Woodson changed the invoices as Defendant Karp had asked.

**Plaintiff Reports Defendant Woodson's Harassment to Defendant Karp**

170.    Working at Defendants gave Plaintiff extreme anxiety. She continuously refused to engage in Defendant Karp's and Defendant Woodson's illegal accounting practices, and yet they asked her to do so again and again.

171.    Meanwhile, Defendant Woodson continued to make sexually inappropriate comments to her on a daily basis.

172.    In addition, her interactions with Defendant Woodson were unbearable, given his hostility and his sexual harassment of her. Finally, Plaintiff could not bear the sexual harassment any longer, and had to talk to Defendant Karp about stopping the harassment.

173.    On January 8, 2018, Plaintiff asked for a meeting with Defendant Karp to let him know that she was absolutely unable to work with Defendant Woodson anymore.

174.    She told Defendant Karp that Defendant Woodson refused to talk or interact with her and did not assist her in her work at all. In addition, Defendant Woodson made Plaintiff feel

"uncomfortable as a woman" and, more specifically, that Defendant Woodson was always talking sexually about other women in front of her.

175.     Shockingly, Defendant Karp only made excuses for Defendant Woodson's behavior saying "Well, Mike is a man, a sexual man and a lonely man" and so it wasn't his fault if he wanted to talk to her about his sexual and dating life.

176.     Plaintiff also said that there were some "shady things" going on at Defendants, and she did not feel comfortable "going along with it."

177.     Defendant Karp told Plaintiff that they would have to work something out and said vaguely that perhaps she could help him with Defendants' "marketing" and other tasks that he would think up later.

178.     Plaintiff was surprised that she was being taken away from the Accounting department given her extensive experience but wanted to do anything she could to get away from Defendant Woodson's harassment.

179.     Defendant Karp told Plaintiff that she would now report to him directly, and that she would continue to do operations and payroll but would no longer report to Defendant Woodson.

180.     Plaintiff was devastated that instead of Defendant Woodson suffering any consequences for his harassment of her, she was demoted to a non-accounting position.

181.     Plaintiff decided to have a good attitude about this change. She was wary of working with Defendant Karp because of his hostility to her on account of her pumping breast milk. However, faced with the impossible choice of subjecting herself to either hostility from Defendant Karp or hostility and sexual harassment from Defendant Woodson, Plaintiff reluctantly agreed to report to Defendant Karp.

182.     To her dismay however, Plaintiff was forced to continue sharing an office with Defendant Woodson. Sometimes, Plaintiff would become so uncomfortable that she took her laptop and work in a conference room or into the kitchen so she would not be subjected to his harassment.

183.     From the moment that Defendant Karp told Defendant Woodson that Plaintiff would no longer be reporting to him, Defendant Woodson ignored her entirely at the office, refused to interact with her whatsoever, even though they shared an office.

**Staff Accountant and HR Associate Rosario Suddenly Quits Because of
Defendants' Illegal Activities**

184.     On January 10, 2018, Staff Accountant and HR Associate Rosario, who had worked at Defendants for many years, announced that she would quit her job.   Upon information and belief, she did so because she did not agree with the illegal things going on at Defendants.

185.     Plaintiff took over Staff Accountant and HR Associate Rosario's Human Resources responsibilities when she left.

**Defendant Karp Calls Women "Stupid" and Biologically Lesser Than Men**

186.     Although Plaintiff was initially relieved that Defendant Woodson no longer had the opportunity to discriminate against her, she was appalled when Defendant Karp began subjected her to an even more severely hostile work environment.

187.     In or about early January 2018, Defendant Karp hired a new executive assistant named Goldy Landau (hereinafter "Executive Assistant Landau"). Executive Assistant Landau considered herself an "ex-Chassidic [ultra Orthodox] Jew" having left the Orthodox community during her teenage years. She went to Wellesley College and participated in a joint program with MIT for neuroscience.

188.     Defendant Karp told Plaintiff that he found Executive Assistant Landau particularly interesting. In a conversation with Plaintiff he told her that in his view, women who were raised in an Ultra-Orthodox community were "stupid compared to men." He believed that women had biological differences in their brains that made them "lesser than men" and that when he met women "like" Plaintiff and Executive Assistant Landau his "mind was blown."

189.     Plaintiff was shocked, and did not know what to say. She just continued talking about work related matters.

### Defendant Karp Tells Plaintiff A Disgusting Sexual Story

190.     In or about January 2018, about two weeks after Executive Assistant Landau was hired, Executive Assistant Landau and Plaintiff were sitting in Defendant Karp's office going over tasks.

191.      Defendant Karp and Executive Assistant Landau began talking about life growing up in the Ultra-Orthodox community. Defendant Karp asked Plaintiff and Executive Assistant Landau if they wanted to hear "something funny" and he suddenly got up and shut and locked the door.

192.     Defendant Karp sat back down and told them about how he "found out what sex was." As he began to recount his story, Plaintiff told both him and Executive Assistant Landau that she did not feel comfortable and wanted to leave. Defendant Karp nonetheless insisted that she stay, furiously shook his head and said that she that she "need[ed] to hear this."

193.     Plaintiff was frozen in her seat. She struggled to find a way to exit the room without angering Defendant Karp and jeopardizing her job.

194.     Defendant Karp told Plaintiff and Executive Assistant Landau that while he was engaged, he went to classes taught by a rabbi before marriage. The rabbi was supposed to tell him

about sex in the last class, but Defendant Karp missed the class. When he asked the rabbi if he was missing important material, the rabbi told him "not to worry" and that "he'd figure it out."

195.     Defendant Karp said that the night of his wedding, his wife tried to touch him and he "freaked out on her," and "asked her what she was doing." He said he was "totally shocked" and had "no idea that this is what men and women were supposed to do."

196.     He said that his wife was very patient, "god bless her," and ended up guiding him through everything and he "did the job."

197.     Plaintiff sat in her chair and felt horrified, and said that she should leave, but Defendant Karp just called Plaintiff a "prude" and laughed at her maliciously.

### Defendant Karp Harasses Young Women, and Defendant Woodson Tells Plaintiff That Her Mother, an Orthodox Jewish Woman, is "Hot"

198.     Defendants had a "Super Bowl Party" at the offices on February 4, 2018.

199.     Defendant Karp told employees that they should invite their families to the party. Plaintiff brought her husband, her baby, her siblings, and her parents.

200.     Executive Assistant Landau brought a group of "ex-Chassidic" (ex-Ultra Orthodox) young women in their 20s and Defendant Karp sat in the middle of them on the couch and flirted with them throughout the night.

201.     Drunk, he asked Plaintiff to "interview" one of the young women so he could hire her as a receptionist. Plaintiff objected, saying that this was not how Defendants should hire employees, but Defendant Karp shot back that he didn't care, and that he was going to hire her anyway because she was "young and attractive, and it was just a receptionist position"

202.     Drunk, Defendant Karp offered her the job on the spot at the party, and she accepted.

203.    Also that night, Defendant Woodson met Plaintiff's parents, and told Plaintiff on numerous occasions that her mother, an Orthodox Jew who dressed very modestly was "hot."

**Defendant Karp Again Makes an Inappropriate Comment About Women**

204.    The next day, February 5th, 2018, Plaintiff, Executive Assistant Landau and Defendant Karp met in his office and he mentioned that he had a great time meeting all of Executive Assistant Landau's friends, particularly one friend whom he found "beautiful and very interesting."

205.    He named the girl, and told them both that when he asked her the reason, she left the Ultra-Orthodox community, she replied casually, "because she was horny."

206.     Plaintiff sat quietly, extremely uncomfortable and Defendant Karp once again called her a "prude."

**Defendant Karp Tells Her in Explicit Detail About Sex With Women
Who Are Not His Wife**

207.    In or about the end of January or early February, Defendant Karp and Plaintiff had a meeting.

208.    Defendant Karp somehow turned the discussion to his many "girlfriends" and times he spent "clubbing."

209.    Plaintiff was shocked when he mentioned these "girlfriends," because as far are she knew, he had been married for the last 25 years. Plaintiff asked, "Girlfriend, you mean your wife?" and he said No, that he "had a lot of girlfriends" while he was married.

210.    He said that all of this happened while he was married and that he and the women did "everything but sex" and that they would give him "blow jobs." He said his wife knew and started to giggle to Plaintiff that "she even caught [him] once."

211.     When he saw the horrified look on Plaintiff's face, he said: "What, you don't think [your husband] will do this to you? All men cheat, no one stays monogamous, it's impossible, it's not how God made us."

212.     Disgusted, Plaintiff said that she had a relationship "built on love and respect," and that her husband would never do such a thing.

213.     Defendant Karp laughed and said she was naive, and that she would "see."

**Defendant Karp and Defendant Woodson Make Blatantly Racist Comments About an African-American Job Applicant**

214.     On or about a Friday in January or February 2018, a recruiting agency sent Defendants a very promising candidate for an Accounting Manager position, Sharon [Doe] (hereinafter "Ms. Doe").

215.     Ms. Doe first interviewed with Defendant Woodson, who sent both Plaintiff and Defendant Karp an email after the interview stating that he "liked her" and that her experience was in line with what he was looking for but that he "wanted [Defendant Karp] to meet her."

216.     That Monday, in a meeting between Plaintiff, Defendant Woodson, and Defendant Karp, Defendant Woodson reiterated that Ms. Doe was extremely well qualified, and he liked her, but said cryptically again that he needed Defendant Karp to "meet her."

217.     Plaintiff was utterly confused given that Defendant Woodson was raving about Ms. Doe's qualifications, and she did not understand why he kept vaguely referring to her being "approved" by Defendant Karp. His tone of voice was so unusual that she asked Defendant Woodson why he needed Defendant Karp to meet her if she was so wonderful. Defendant Woodson blurted out that it was because "She [was] Black, and her address show[ed] that she may be from a 'ghetto' neighborhood."

218. Plaintiff's mouth dropped open. She was absolutely flabbergasted and said to Defendant Woodson that she was infuriated by the racism in his comment, and that if Ms. Doe was qualified, she should absolutely be given the job.

219. Defendant Karp ignored Plaintiff's objection and stated that he would have to meet her to "check her out."

### Defendant Woodson States That The Black Applicant Might Not Be "Clean" And He Wants Plaintiff to Do a "Background Check" on Her

220. Later that day, Defendant Woodson told Plaintiff that he wanted to be sure that Ms. Doe was a "clean person."

221. Defendant Woodson ordered Plaintiff to do a background check on Ms. Doe to make sure she was "clean," and Plaintiff told him under no circumstances would she do this, because they had never done a background check on any other potential hire, and they "certainly weren't going to start now because that is racist and discriminatory."

222. Later that week, Defendant Karp, Defendant Woodson, and Plaintiff had an interview with Ms. Doe, and Plaintiff found her to be a hard worker and extremely qualified, with 15-20 years of real estate accounting experience.

223. After the interview, Plaintiff insisted to Defendant Karp and Defendant Woodson that they should definitely hire her.

224. Apparently, Ms. Doe passed Defendant Karp and Defendant Woodson's racist "test" of her background, because they reluctantly hired her, and she started working at Defendants the following week.

225. Upon information and belief, despite the fact that Plaintiff insisted that Defendant Woodson and Defendant Karp hire Ms. Doe because of her high qualifications, Defendant Karp

and Defendant Woodson discriminated against and harassed Ms. Doe because of her race after she began working at Defendants.

### Defendant Karp Dares Plaintiff to "Touch Him"

226.    In early 2018, Plaintiff scheduled a photographer to come to the office to take photos of Defendants' employees for a newsletter that Defendants would send out to stakeholders about Defendants' various projects entitled "Hello Living Magazine."

227.    While the photographer was taking photos of Defendant Karp, Plaintiff asked him to angle himself in a certain way, and he responded, with a lewd look on his face: "You know, you can touch me."

228.    Plaintiff shook her head and turned away in shock and felt utterly shamed and disgusted. He said with a menacing voice: "What do you think is going to happen if you touch me, anyway?"

229.    Defendant Karp laughed maliciously, apparently out of enjoyment at the fact that he had made her uncomfortable.

230.    Later on, while the photographer was taking pictures of Plaintiff for the magazine, she caught Defendant Karp looking her up and down and taking photographs of her with his phone.

231.    Plaintiff requested that Defendant Karp stop taking photos of her on his phone, to which he responded "Why not? You look amazing!" Plaintiff was too uncomfortable and shocked to respond.

**Defendant Woodson Takes Plaintiff's Responsibility Away Because of Her
Childcare Accommodations**

232.     In or about the middle of February, Maria Mir (hereinafter "Ms. Mir") started as an office intern, and Defendant Karp and Defendant Woodson assigned Plaintiff to be her supervisor. She and Ms. Mir got along very well, and Plaintiff was proud to be a mentor to her.

233.     However, on or about March 5, 2018, while Plaintiff was on vacation, she saw that Ms. Doe had sent an office-wide email announcing that she would be training and managing Ms. Mir.

234.     Plaintiff was shocked to get this email, as no one had informed her of this switch in supervision. She sent a text message to Ms. Mir to ask what had occurred, who said that Defendant Woodson told her that he did not want Plaintiff to supervise her.

**Defendant Woodson Takes Away More of Her Responsibility Because of Her
Childcare Accommodations**

235.     On March 6, 2017, Defendant Woodson sent Plaintiff an email at 3:00 am saying that he spoke with Defendant Karp and that they decided that Ms. Doe would now be overseeing all of the staff that Plaintiff had been overseeing, and she would be taking over Plaintiff's Human Resources responsibilities.

236.     Defendant Woodson told her blatantly that he was doing so because she was a mother and because she had childcare accommodations, stating in his email:

> You should know I'm for you, please don't take personally. I totally understand. I
> have 2 kids too, who are the most important thing to me - so important for you to
> be there for yours.  Plus, she's cute, ha.  Do what you can do, & let the rest go -
> work a part-time arrangement out with Eli, on an hourly basis, committing to what
> you can fully handle/cover out of office, then just help out when in office - that way
> you can both have win-win, will work out much better in long run, actually for
> everyone. I am trying to tell you as your friend, because I actually care.  Or I
> wouldn't.

237. Plaintiff was devastated. She knew she worked as hard and diligently as every other employee at Defendants.

238. Plaintiff had never once complained about her workload, and Defendants had never complained formally or informally about the job that Plaintiff was doing and she always worked diligently from home.

239. Plaintiff did not reply to the email Defendant Woodson sent her.

**Plaintiff Reports the Discrimination To In-House Counsel**

240. That same day, Plaintiff reported what Defendant Woodson had emailed her to In-House Counsel Miller. She told In-House Counsel Miller that Defendant Woodson was retaliating against her by taking away her responsibilities because she had childcare accommodations. She also said that she absolutely could continue to supervise her staff and could continue with her Human Resources responsibilities even though she worked from home two days a week.

241. In-House Counsel Miller said that Defendant Woodson and Defendant Karp just wanted "face time in the office." She then "explained" that his email was "dangerous and inappropriate" because he "couched" it as her "friend."

242. In-House Counsel Miller told Plaintiff she shouldn't question what a "good job" she did, and that she should save the email because it was an "unsolicited email sent in the middle of the night."

**Defendant Woodson Suddenly Falsely Accuses Plaintiff of
Not Doing Her Job**

243. On March 13, 2018 at 5:00 pm, Plaintiff received the last of Defendants' employee time sheets, and was busy processing payroll.

244. At 4:30 pm, Defendant Woodson called Plaintiff's cell phone, which she did not answer because she was working to get the payroll done.

245.    Defendant Woodson then emailed Plaintiff, with "payroll?" in the subject line, asking Plaintiff what the "status was" with the payroll accounts.

246.    Plaintiff responded that she had just received the last timesheets, she was working diligently, and the payroll accounts would be completed shortly.

247.    Defendant Woodson responded to Plaintiff's email about the payroll deadline saying falsely that the deadline was 5:00 pm. He reprimanded her for being late, and said that he had to call the processing company and hoped that the deposits had gone through.

248.    Plaintiff was shocked. She knew that she had done nothing wrong, and that the deadline for processing payroll was 5:30 pm and not earlier, and so there was no reason for him to allegedly call the processing company.

249.    Plaintiff replied by saying that he was wrong, she had been processing payroll since she started at Defendants, and 5:30 pm had always been the deadline. She also showed him communications between herself and Staff Accountant and HR Associate   confirming the 5:30 pm deadline.

250.    Defendant Woodson suddenly viciously attacked Plaintiff's work ethic and scolded her for allegedly not doing her job, which was entirely unfounded given she had been successfully processing payroll since she started at Defendants.  He then bizarrely and aggressively stated that her doing things "right" was even "more important" given that she was "rarely in the office."

251.    Defendant Woodson ended the email stating point-black that Plaintiff would no longer be responsible for payroll, and that she should remove her title of "Controller" from the bottom of her email signature.

252.    Just as Plaintiff has finished processing the payroll by 5:30 pm, Defendant Karp sent a message to Plaintiff asking if she had processed payroll. She responded: "Yes, why?"

Defendant Karp did not respond.

253. Plaintiff sent an email message telling Defendant Karp that Defendant Woodson was harassing her, and they needed "to have a conversation about it." Defendant Karp did not reply.

## Plaintiff Reports the Harassment to In-House Counsel Miller

254. On March 14, 2018, Plaintiff reported Defendant Woodson's behavior to In-House Counsel Miller. Plaintiff told In-House Counsel Miller that Woodson was "constantly harassing" her and that she wants "no direct communication with [Woodson] at all."

255. In-House Counsel Miller dismissed her concerns, and told Plaintiff simply to "ignore" his emails or "deal with it."

256. In-House Counsel Miller bizarrely blamed Plaintiff for the harassment. In-House Counsel Miller saying that she didn't know why he hated her, but Plaintiff should "think back" on what she might have done to him.

## Plaintiff Tells Defendant Karp About Defendant Woodson's Harassment

257. On or about March 14, 2018, Defendant Karp charged into Plaintiff's office and demanded that they sit down for a meeting there and then.

258. Plaintiff again reported to Defendant Karp that Defendant Woodson was harassing her, and said that she felt utterly attacked by him.

259. Rather than discuss the harassment, Defendant Karp dismissed Plaintiff's pleas for help, and told her that Defendant Woodson was just "stressed out." Defendant Woodson quickly informed Plaintiff that she would no longer be responsible for doing the payroll, which would be taken over by Ms. Doe.

260.     Plaintiff was shocked that yet again, her responsibilities were taken away because Defendant Woodson continued to harass her, and discriminate against her as a woman and a mother. She noted that half of her responsibilities had been taken away.

261.     Defendant Karp told Plaintiff that he needed her to "define her role" at the company. He told Plaintiff that since she had her baby she had "changed," and had "less drive." He also said that she was "not reliable," because she was in the office only three days a week.

262.     Exasperated, Plaintiff told Defendant Karp that she was an exceptional worker, and she could certainly do her job while working from home, on the phone and on her laptop.

263.     Desperately trying to find something that she could do at Defendants that would save her job, Plaintiff said that she could do investor relations, marketing, and operations, and Defendant Karp agreed to allow her to do these non-accounting responsibilities.

264.     Plaintiff was relieved that she could save her job by suggesting that she do something else at Defendants, but knew that her job was precarious, and that she had better watch her back because Defendant Woodson was trying to get her fired.

### Plaintiff Reports CFO's Harassment to In-House Counsel Miller

265.     On March 15, 2018, Plaintiff approached In-House Counsel Miller and told her about how she still felt incredibly threatened in the office by Defendant Woodson, and that she felt harassed and discriminated against in the workplace as a woman and a mother.

266.     In-House Counsel Miller did not answer Plaintiff's plea but instead told Plaintiff coldly that Defendant Woodson's suggestion that she change her title and consider a part time arrangement "wasn't so crazy."

267.     In-House Counsel Miller told Plaintiff that once she left the accounting department, the terms of her job contract had "become negotiable," and Defendant Karp could now negotiate

a change in her salary and her days worked.

268.    She then dismissed Plaintiff's concerns, saying she should have a conversation with Defendant Karp about her role at the company, and ended the conversation.

### Defendants Constructively Discharge Plaintiff

269.    On March 19, Defendant Karp called Plaintiff and told her that her job at Defendants was "not going to work out," because he could not afford to pay her current salary for marketing, investor relations and operations.

270.    Defendant Karp told Plaintiff that he would offer her a job as an "independent contractor," based on the projects that she did. He again accused her of not doing work while she was at home.

271.    Plaintiff was devastated. She reminded Defendant Karp again that she was absolutely doing her job when she was working from home. She told him yet again that her commute was one and half hours each way, and she could not take three hours of her day because she was a new mother.

272.    She further reminded him that when he hired her he told her that she would get a raise and bonuses on top of her salary, but that this never materialized.

273.    Defendant Karp responded that her role just "didn't work."

274.    On March 21, 2018, Plaintiff was working from home when she spoke with Defendant Karp. CEO changes his "offer" yet again, telling Plaintiff that she could take a part-time job for $40 an hour, and only be paid when she clocked in and out of the office.

275.    Plaintiff was desperate, and told him that she could not afford to take this pay cut and care for her family. She anxiously offered to take on extra things to stay at a higher pay.

276.     Plaintiff said again that she was hired under certain terms, and that he could not renege on their agreement. She said that since she had returned from maternity leave, he had been utterly hostile to her childcare accommodations and the fact that she was pumping breast milk.

277.     Defendant Karp cut Plaintiff off and said "Well, if you won't take my offer then it's not going to work out," and he told her that he would send her an offer letter.

278.     The next day, March 22, 2018, Plaintiff spoke to Defendant Karp on who told her, again, that she should expect an "offer letter" for a new position at Defendants. Later on in the day, Plaintiff noticed that her email had been disabled.

279.     The day after, March 23, 2018, finally received the "offer letter" in her personal email account.

280.     Plaintiff was terminated from Defendants and offered a full-time position as a marketing manager at $40 an hour. The letter also refused to give Plaintiff childcare accommodations, instead providing that Plaintiff was expected to work in the office five days a week.

281.     Defendant Karp told Plaintiff: "Look I know you can't accept this offer. Come work as an independent contractor." Shockingly, Defendant Karp was admitting point-blank that he was constructively discharging Plaintiff by offering her a position that he knew she would not take.

282.     Plaintiff pointed out that she knew of male employees who had been given new positions or even been demoted at Defendants but got increases in their salary. She asked why she was different, and whether it was because she was a female and a caretaker.

283.     Then Plaintiff asked Defendant Karp why he never told her in January, when he changed her position from that of Controller, that this change would happen, and said that she would have reconsidered her position there as Controller if she had known.

284.    Plaintiff objected again that she was being pushed out of the company because she was a mother who had childcare accommodation and her arrangement was always attacked because she had a baby at home. She thanked him, and hung up.

285.    Plaintiff did not respond to his "offer letter," and was constructively terminated from Defendants.

### A Former Partner of Defendant Karp Threatens Plaintiff's Father Over the Phone

286.    Plaintiff retained counsel in the instant matter on April 16, 2018. Counsel sent a Letter of Representation, informing Defendants that Plaintiff retained counsel for "gender discrimination" and "sexual harassment" claims on May 7, 2018.

287.    On May 10, 2018, Abraham Leifer, who is, upon information and belief, a business partner at Defendants, sent Plaintiff's father horrifying and threatening text messages. He stated that Plaintiff was a "horrible human being" and that Plaintiff (and her father) were "disgusting" for suing Defendants, and her father was a "lying scumbag." Leifer said that he "wish[es] all the bad for [Plaintiff's] family." He also texted Plaintiff's father, who was being treated for cancer: "If your cancer doesn't kill you, I hope someone else does. Are you dead yet?"

288.    Plaintiff was horrified, and filled with anxiety. Not only was she entirely traumatized by her severely discriminatory and harassing experience at Defendants, but her family, specifically her ill father, was attacked by Defendants and she became physically sick as a result of the traumatic attacks on her father.

### Plaintiff Demands a Jury Trial in This Matter

289.    Plaintiff demands a jury trial in this matter.

## AS AND FOR THE FIRST CAUSE OF ACTION

*(Gender and Pregnancy Discrimination in Violation of Title VII, the Pregnancy Discrimination Act, Gender, Pregnancy, Breastfeeding and Caregiving Discrimination under the New York City Human Rights Law, the New York State Human Rights Law, the New York Labor Law, the New York Civil Rights Law and the New York Public Health Law)*

290.      Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

291.      Defendant Hello Living has discriminated against Plaintiff in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"), and the Pregnancy Discrimination Act. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant Hello Living's wrongful conduct.

292.      Defendants have further discriminated against Plaintiff in violation of the New York State Human Rights Law and the New York City Human Rights Law by subjecting her to different treatment on the basis of her gender and status as a pregnant woman, as a breastfeeding woman, and as a caregiver. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

293.      Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-pregnant, non-breast-feeding and non-care-giving  employees and by subjecting her to severe and pervasive sexual harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, and other forms of discrimination on the basis of her sex and status as a pregnant woman, a breast feeding woman and a care-giver in violation of  the law.

294.      Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

295.      By reason of Defendants' discrimination, Plaintiff is entitled to all remedies

available for violations of Title VII and the Pregnancy Discrimination Act as to Defendant Hello Living LLC, and applicable New York State and New York City laws, including the New York City Human Rights Law, the New York State Human Rights Law, the New York Labor Law, the New York Civil Rights Law and the New York Public Health Law as to all Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Retaliation in Violation of Title VII, the Pregnancy Discrimination Act, Gender, Pregnancy, Breastfeeding and Caregiving Discrimination under the New York City Human Rights Law, the New York State Human Rights Law, the New York Labor Law, the New York Civil Rights Law and the New York Public Health Law)*

296.　　Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

297.　　Plaintiff repeatedly reported to Defendants about Defendants' discriminatory treatment of her.

298.　　In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to the denial of a promotion, a hostile work environment, disparate treatment, and a termination of Plaintiff's employment.

299.　　Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

300.　　As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

301.　　By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII and the Pregnancy Discrimination Act as to Defendant Hello Living LLC, and applicable New York State and New York City laws, including the New York

City Human Rights Law, the New York State Human Rights Law, the New York Labor Law, the New York Civil Rights Law and the New York Public Health Law as to all Defendants. Plaintiff shall seek attorney's fees and punitive damages.

**AS AND FOR A THIRD CAUSE OF ACTION**
*(Religious Discrimination in Violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law)*

302. Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if set forth herein.

303. Plaintiff is a Jewish female, and is therefore a member of a protected class. Plaintiff was qualified to work as an employee for Defendant Hello Living and she satisfactorily performed the duties required by the positions she held at Defendant Hello Living.

304. Defendants intentionally subjected Plaintiff to a hostile work environment, disparate treatment, and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff's unlawful discharge because of her religion in violation of Plaintiff's statutory and constitutional rights.

305. The discriminatory actions perpetrated against Plaintiff were performed purposefully or with willful indifference by Defendants and were in accordance with Defendant Hello Living's custom and/or policy of discrimination.

306. By reason of Defendants' repeated violations of Plaintiff's statutory and constitutional rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

307. As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her

employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

308.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII as to Defendant Hello Living LLC, and for violations of the New York State Human Rights Law and the New York City Human Rights Law, against all Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(i)     On the First Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined at trial but in any case, no less than $7,500,000.

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined at trial but in any case, no less than $7,500,000.

(iii)   On the Third Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case, no less than $7,500,000;

(iv)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
        August 6, 2019

Respectfully submitted,


GODDARD LAW PLLC
*Attorney for Plaintiff*

By: _____/s/_____
Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Office: 646-504-8363
Fax: 212-473-8705
Megan@goddardlawnyc.com